ST. ANTHONY FALLS WATER-POWER COMPANY *vs.* ORLANDO C.
MERRIMAN and others.

March 1, 1886.

**Reformation of Contracts—Requisites to Jurisdiction.**—The proposition
which lies at the foundation of every suit to reform a written contract is
that the court cannot make such a contract as it thinks the parties ought
to have made, or would have made, if better informed, but merely makes
it what the parties intended it to be.

**Same—Actual Agreement as well as Mistake must be proved.**—Every
reformation of a contract by the court presupposes that there has been an
agreement actually made,—a meeting of the minds of the parties as to
the terms of the contract,—but which for some cause they have failed to
fully or correctly express in the writing; and the burden is upon the
party asking the reformation to prove both that there was this agreement
and that the writing deviates from it. In such a case the court merely
reforms it so as to correctly express the actual agreement of the parties.

**Same—Reformation Refused.**—Upon the facts found in this case, there is
no such antecedent agreement to which the writing can be conformed.
There is no finding that there was any meeting of the minds of the par-
ties, or any agreement actually entered into, or any intention or mutual
understanding of the parties that plaintiff should *deed* any other or greater
amount of water-power than that actually expressed in the deed, to wit,
"fifty cubic feet per second." In the absence of any such agreement,
intention, or understanding, the mere fact that both parties mistakenly
believed that the amount specified was ample to operate all the machinery
of a certain mill, and, but for that belief, would not have made the con-
tract which they did, furnishes no ground for reforming the deed so as to
convey sufficient water-power for that purpose.

By deed, bearing date May 22, 1871, the plaintiff, owner of the
water-power created by the flow of water in the east channel of the
Mississippi river, at Minneapolis, and of a dam across that channel,
conveyed in fee to the defendants' grantors the right to erect a saw-
mill, and to draw from the east channel of the river "fifty cubic feet
of water per second, under a head and fall of thirty-five feet, provided
said head and fall can be obtained at a depth of eight feet below the
lime rock at the wheel-pit on said premises; but if said head and fall

of thirty-five feet cannot be obtained at a depth of eight feet below said lime rock at said wheel-pit, then the said party of the second part shall have the right perpetually to draw such additional quantity of water per second as will make a power equal to the power attainable by the use of fifty cubic feet of water per second under a head and fall of thirty-five feet."

The plaintiff brought this action in the district court for Hennepin county, to restrain the defendants from drawing from the river and using at such mill a greater quantity of water than that described in the deed, and for damages for excessive user by defendants prior to the commencement of the suit. The principal issue in the case was upon a counterclaim pleaded by the defendants, in which they alleged error in the deed and prayed for a reformation.

The action was tried before *Young, Lochren,* and *Koon,* JJ., whose findings upon the issue as to the reformation of the deed were, in substance, as follows:

In November, 1870, the plaintiff contemplated the erection of a dam, which it afterwards built, across the east channel of the river, and caused to be made, by one Conner, a millwright in its employment, a plat of eight mill-sites, covering the entire width of the east channel, and numbered consecutively from 1 to 8. It was then the purpose of the plaintiff to lease these sites, with water-power for operating saw-mills, and to procure the lessees to build eight saw-mills, one on each site, uniform in size, machinery and capacity; and the plaintiff caused to be made by Conner a plan for one of such mills, showing the interior, with the dam, bulk-head, platform, etc., "and also a plan of the main floor of such saw-mills, showing two double rotary saws, one double fifty-four inch gang of saws; two double gang edgers, and nine cut-off saws, located in their respective places on such floor."

Afterwards, and in the same month, the plaintiff negotiated with defendants' grantors for leasing to them mill-site No. 1, with power, and for the building of a saw-mill by such lessees thereon. The plaintiff exhibited to the intending lessees the plat and plans, and fully explained them. These negotiations were upon the mutual statement and understanding that if the lease should be made, the

lessees should forthwith erect, on mill-site No. 1, a saw-mill con-forming in all respects to the plan made by Conner, and would place and operate upon the main floor all the saws shown upon Conner's plan for such floor, and also, in the basement below, a shingle-machine and lath-machine; and that the plaintiff should lease with the mill-site "an amount of water-power ample and sufficient to run all such saws and machinery." Upon this mutual understanding and statement, the specific terms of the lease were agreed to.

During the negotiations, in agreeing upon the terms of the lease and the manner in which they should be expressed, the lessees proposed that the water-power should be described and defined as "an amount of water-power sufficient to run and operate all the saws and machinery so proposed and intended to be put into said saw-mill to be erected on such site by said lessees." The plaintiff admitted that it was the purpose and intention of all parties that water-power should be leased sufficient and ample to operate all such saws and machinery, but objected to the use of the language proposed by the lessees as not certain, technical, or business-like. The plaintiff then procured Conner to estimate and compute the amount of water-power which would be required to run and operate each of the saws and machinery so intended to be placed in the mill. The amount of power, in the aggregate, as computed by Conner, and by him reported to plaintiff and to the lessees, was one hundred and fifty horse-power. Other persons, then stockholders of plaintiff, experienced in the use of water-power as applied to machinery, were applied to by the parties and confirmed Conner's estimate. From Conner's estimate, thus confirmed, the plaintiff and the lessees were led to and did believe that one hundred and fifty horse-power of water would be enough to operate all the saws and machinery in the proposed mill. But, to insure the lessees that the amount of water-power to be demised by the lease would be ample for that purpose, without doubt or question, the plaintiff proposed, and the lessees agreed thereto, that the water-power demised by the lease should be two hundred horse-power, to be described in the written lease by the equivalent terms of fifty cubic feet of water per second, under a head and fall of thirty-five feet. In agreeing to this amount of two hundred horse-power, and the terms

by which it was to be and was described and defined in the lease, the plaintiff and the lessees understood and believed that this would furnish an excess of power, which excess might be used for other machinery to be located elsewhere, and moved by a shaft extending from the leased premises. "But for the belief of all of said parties that such amount of two hundred horse-power was and would be sufficient and ample to operate all such saws and machinery in said saw-mill, neither such amount nor the description thereof adopted in said lease, would have been agreed to by said parties." The negotiations being thus concluded, the lease was made in writing, December 13, 1870, after the lessees had begun building the mill, and was soon afterwards duly recorded. This lease was for a term of ten years from June 1, 1871.

The lessees built the saw-mill, as provided in the lease, and placed in it the machinery on the main floor and in the basement required by Conner's plan, and in accordance with the understanding of the parties when negotiating for the lease; and from May, 1871, until November of that year the lessees operated the mill to its full capacity.

The 5th and 6th findings referred to in the opinion are, in substance, as follows: In the spring, summer, and fall of 1871, the plaintiff's stockholders, to relieve it from pecuniary embarrassment, agreed to buy from it the eight mill-sites, with the same amount of water-power to each mill-site that had been leased with mill-site No. 1, and also to buy two water-powers of two hundred horse-power each, to be used upon other lots to be designated by the purchasers. In carrying out this agreement, the lessees of mill-site No. 1, having become stockholders of the plaintiff, purchased that mill-site and the water-power which had been leased to them therewith, at the price of $5,000, and upon such purchase the plaintiff executed and delivered to them the deed before mentioned. This deed, though bearing date May 22, 1871, was not in fact executed and delivered until December, 1871, and after the purchasers had operated the mill under the lease for one full sawing season. "During the negotiations for purchasing culminating in said deed, there was no express agreement as to the amount of water-power included in said purchase and to be

described and defined in said deed, other than that it was to be the same amount of water-power which had theretofore been leased in and by the aforesaid lease between the same parties; and in describing said water-power in said deed, the terms of description were therein copied from said lease, without objection on the part of any one. All the parties to said deed, at all times during the negotiations for such purchase, and at the making and delivery of said deed, still understood and fully believed that the amount of water-power so defined and described in said lease and in the said deed comprised full and ample power to operate all the saws and machinery in said saw-mill, and leave a possible excess above that, and that it comprised at least as much water-power as said lessees had been using in the operation of said mill during the sawing season of 1871; and but for that understanding and belief the description and definition of water-power written in said deed would not have been made nor assented to by the parties to said deed."

"6. At or about the same time of the purchase and conveyance of said saw-mill site No. 1, to said Butler, Merriman and Lanes, the other seven said saw-mill sites were sold and conveyed by said plaintiff to others of its stockholders for like considerations, and with like description and definition of water-power conveyed with each. And said two unlocated water-powers of two hundred horse-power each were also sold and conveyed to stockholders of said plaintiff, upon what exact terms does not appear; but it does appear that all the stockholders of said plaintiff were concerned in said purchase upon the terms of what was supposed to be an equality proportionate to their respective interests as such stockholders."

In point of fact the amount of water-power described in the lease and deed (and which is equivalent to two hundred horse-power) has never been sufficient to operate the saws and machinery so put into the saw-mill, and is only about one-third of the amount of power necessary and which defendants have always used for that purpose, that amount being 146 78-100 cubic feet of water per second under a head and fall of 35 feet, or its equivalent of water-power. Ever since the mill was built the saws and machinery therein have remained the same, and the defendants and their grantors have, at all times dur-

ing the sawing season of every year since the mill was built, used in operating it all the power necessary to operate all the saws and machinery, in the full belief that they were entitled thereto under the lease and deed, and without objection, on the part of the plaintiff, until the autumn of 1883. It does not appear that plaintiff knew, prior to that time, that the amount of water-power so used was greater than that specified in the lease or deed, or that either party, prior to that time, supposed that more water-power than that specified in the lease and deed could be used in operating the said saws and machinery.

As conclusions of law the court found (1) that the defendants are not entitled to a reformation of the deed or lease; (2) that the plaintiff is not entitled to a permanent injunction as prayed in the complaint; (3) that "the plaintiff is entitled to have and recover judgment against said defendants for the reasonable value of the excess of water-power used by said defendants in the running and operating of their said mill since the 15th day of October, 1883, and, to ascertain the value of the same, is entitled to have a reference and accounting as prayed in the complaint."

The defendants appeal from an order denying their motion for a new trial.

*E. M. Wilson, Gordon E. Cole, J. B. Gilfillan,* and *Gilfillan, Belden & Willard,* for appellants.

*R. C. Benton* and *Geo. B. Young,* for respondent.

MITCHELL, J.   The question raised by this appeal is whether the defendants are, upon the facts found, entitled to a reformation of the deed set out in their answer. Touching the previous lease between the same parties, the finding (the third) leaves it in much doubt whether their minds met upon and assented to the proposition, as their contract, that plaintiff should lease to defendants sufficient water-power, whatever amount that might be, to operate the machinery of the proposed mill, and that, for the purpose of carrying that intention into effect, they inserted in the written lease, as an equivalent expression, the term "fifty cubic feet of water per second, under the head and fall of thirty-five feet;" or whether, having started out in their negotiations with that idea, they finally settled down and

agreed upon a transfer of the specified number of feet, although mistakenly supposing that this was ample to run the mill. We are strongly inclined to the opinion that the latter is the correct construction to be placed upon the finding.

But even if we assume the first theory suggested to be the true one, and that the expression above quoted was inserted in the lease under such a mutual mistake of fact as would have entitled defendants to a reformation of the written *lease,* yet it by no means follows that there is any ground for reforming the *deed.* There is now no occasion for reforming the lease. The term for which it was to run expired June, 1881, before the commencement of this action. The defendants during its full term enjoyed the use of all the water to which they claim to have been entitled, and nothing is now claimed against them on that account. The equities of the lease transaction have expired with the lease, and the right of the defendants to a reformation of the deed under which they now hold must depend upon the equities of the deed transaction alone. The only relevancy, if any, of the fact that a mistake was made in the lease, would be for the purpose of showing that a mutual mistake was also made in the deed. Therefore the findings (5 and 6) in respect to the agreement of sale and the execution of the deed really constitute the whole basis of defendants' claim to a reformation of the deed; and it seems to us that these findings entirely eliminate from the case any alleged meeting of the minds of the parties, or any agreement actually made that plaintiff should *deed* water-power enough to operate the mill.

The finding is that "there was no express agreement as to the amount of water-power included in said purchase, * * * other than that it was to be the same amount of water-power *which had theretofore been leased in and by the aforesaid lease.*" There is no finding that there was any meeting of minds, or any agreement actually entered into, or any intention or understanding of the parties, that plaintiff should convey any other or greater amount of water-power than that actually expressed in the written deed as it now stands, viz., "fifty cubic feet per second." It is true the court finds, in substance, that the parties at the time fully believed and understood that this amount of water would be ample to operate the mill, and but for that belief the descrip-

tion and definition of the water-power written in the deed would not have been made or assented to; but it is not found that they made any *agreement* from which the written deed deviates. It does not appear, and cannot be known, what they would have done had they known that 50 feet of water per second was not sufficient to run the mill. It may be presumed that defendants would not have accepted the deed and paid their $5,000 had they been better informed. But there is nothing to show that plaintiff would have agreed, or ever did agree, to convey for $5,000, 600 horse-power instead of 200, or 146.78 cubic feet of water per second instead of 50 feet. The court cannot conjecture what contract the parties would have made had they then understood the facts as they now understand them. Presumably they would either have made none, or else made one for 146.78 feet of water per second, at a much higher price than $5,000.

Two facts must be kept in mind: (1) That this is an action to *reform*, and not to *rescind*, a contract; and (2) that the proposition which lies at the foundation of all suits to reform is that the court cannot make such a contract as it thinks the parties ought to have made, or would have made if better informed, but merely makes it what the parties intended it should be. Every reformation of a contract by the court necessarily presupposes that there has been a meeting of the minds of the parties,—an agreement actually entered into,—but for some cause they have failed fully or accurately to express it in the writing. In such a case the court will step in and reform the contract so as to express the actual intention of the parties; and the burden is upon the party asking the reformation to prove both that there was an agreement and that the writing deviates from it.

Now, the fatal defect in defendants' case is that there is no antecedent agreement to which the writing can be conformed. The plaintiff never agreed to convey, for $5,000, 146 78-100 cubic feet of water per second, or any other or greater amount than that now expressed in the deed. If we should assume to reform this deed in accordance with the prayer of defendants, we would be making a contract for the parties which they never made for themselves. The deed when thus altered would not express the *agreement* of the parties, and the court would be engaged in the singular office of doing right to one party at

v.35м—4

the cost of a precisely equal wrong to the other. This cannot be done.

The defendants invoke the doctrine of estoppel, and contend that plaintiff is estopped by its conduct from asserting that defendants have not the right to use sufficient water to operate their mill. It will be observed, upon examination of the findings, that any representations or expressions of opinion which plaintiffs may have made regarding the sufficiency of 200 horse-power to operate a saw-mill of the plan proposed, were made prior to and with reference to the execution of the lease, and that the expenditures of defendants in building the mill were made, not under or upon the faith of the deed, but of the lease alone. It does not appear that defendants have done any act, or expended any money, in reliance upon the deed, or that they have done anything except what they were bound to do by the lease. In respect to the lease defendants have nothing of which to complain. As before remarked, they have enjoyed during its term all that they claim to have been entitled to, and nothing is claimed of them on account of it. Hence whatever might have been the case, had it been sought to enjoin defendants, during the term of the lease, from using water sufficient to operate their mill or to recover damages from them for using it, we fail to see that, under the facts, there is now a single element of an equitable estoppel. The order denying a new trial must therefore be affirmed.