DONIPHAN, KENSETT & SEARCY RAILROAD COMPANY *v.*
MISSOURI & NORTH ARKANSAS RAILROAD COMPANY.

Opinion delivered July 1, 1912.

1. CONTRACTS—CONSTRUCTION.—In construing a contract all parts of the contract must be considered, and the terms and provisions of each part must be interpreted in the light of all other parts. (Page 481.)

2. RAILROADS—TRAFFIC AGREEMENT—CONSTRUCTION.—Where a traffic contract provided that plaintiff granted to defendant for ten years the use of certain tracks, for which defendant agreed to pay $1 for each mile its trains moved over such tracks, and that defendant would handle no traffic, except pine logs, between certain points, and that defendant would assume all risk of loss, damage or injury which should in any manner occur in or on any track, the use of which was granted, defendant was authorized to handle traffic of any character over plaintiff's track except traffic originating at the points named. (Page 481.)

3. REFORMATION OF INSTRUMENTS—MISTAKE—MUTUALITY.—While a written contract may be reformed for mutual mistake or for mistake of one party induced by the other party's fraud, the mistake must exist in

the agreement, and the instrument as written must not fulfill the intention of the parties nor conform to the agreement as made. (Page 483.)

4. SAME—MISTAKE.—Where a written contract has been executed in conformity with the agreement as to the terms that were to be incorporated therein, and there has been nothing omitted which the parties intended to insert, it can not be reformed for mistake of judgment in that one party relied upon performance by the other of some omitted provision, instead of insisting upon its being reduced to writing and put in the written instrument. (Page 485.)

5. SAME—MISTAKE.—Where the means of information are open to both parties alike, so that by ordinary diligence and prudence each may be informed of the facts and rely upon his own judgment in regard to the thing to be performed or the subject-matter of the contract, if either fails to avail himself of the opportunity, he will not be heard to say he has been deceived. (Page 486.)

6. CONTRACTS—MERGER OF PREVIOUS NEGOTIATIONS.—Antecedent propositions, correspondence and prior writings, as well as oral statements and representations, are deemed to be merged into the written contract which concerns the subject-matter of such antecedent negotiations, when it is free of ambiguity and complete. (Page 488.)

7. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDINGS.— While a chancellor's findings of fact are persuasive on appeal, they are not conclusive; and where they are made on conflicting testimony which is not clear, convincing and beyond reasonable controversy as required by law, such findings will be set aside on appeal. (Page 488.)

8. REFORMATION OF INSTRUMENTS—OMISSIONS.—Where a provision has been omitted from a written contract without mistake or fraud, the courts can not supply such omission, but will leave the contract as the parties made it. (Page 489.)

Appeal from White Chancery Court; *John E. Martineau,* Chancellor; reversed and dismissed.

*Brundidge & Neelly, J. W. & J. W. House, Jr.,* and *Wm. L. Stocking,* for appellant.

1. It is only when a contract is ambiguous or uncertain that parol evidence is admissible to determine what the contract is. 4 Ark. 179; 75 Ark. 55; 86 Ark. 169; 90 Ark. 272; 93 Ark. 1.

2. Where a contract has been reduced to writing and signed by the parties, oral testimony is not admissible to show that they intended to make a different contract. 78 Ark. 574; 80 Ark. 505; 94 Ark. 130.

3. In construing a contract, all its parts must be considered and construed together. 96 Ark. 320; 93 Ark. 497. 94 Ark. 493; 40 Am. Dec. 608; *Id.* 621; 36 Me. 102; 37 Minn; 338; 78 Am. Dec. 414; 186 Mass. 217; 56 W. Va. 402. See also 55 Fed. 701.

4. Where the parties reduce a contract to writing, with knowledge of its contents, parol evidence will not be admitted to show any intent or understanding of the parties different from that expressed in the contract. 13 Ark. 593; 40 Ark. 117; 33 Ark. 416; 67 Ark. 62; 65 Ark. 333; 66 Ark. 393; 64 Ark. 650; 78 Ark. 574; 83 Ark. 105; 86 Ark. 162; 94 Ark. 130; 95 Ark. 131; 53 Ark. 58-65; 56 Ark. 320; 82 U. S. 94; 77 N. C. 128; 72 Fed. 366; 104 Ill. App. 232; 71 Ark. 185; 89 Ark. 309.

5. Where it is sought to reform a contract on the ground of mutual mistake in its preparation, the evidence of such mutual mistake must be clear, unequivocal and decisive, before a reformation will be decreed. 97 Ark. 635; 96 Ark. 230; 91 Ark. 246; *Id.* 62; 90 Ark. 24; 89 Ark. 309; 85 Ark. 62; 84 Ark. 349; 82 Ark. 226; 81 Ark. 166; *Id.* 420; 79 Ark. 256; *Id.* 592.

*J. Merrick Moore* and *W. B. Smith,* for appellee.

1. The proof that the agreement between the parties was that the Doniphan Company should have trackage rights for the handling of pine logs only for manufacture at Doniphan, is clear, convincing and satisfactory. It is also as clearly proved that appellant's president wrote section 1, of article 4, of the agreement so as to give the Doniphan Company the right to handle in its trains through business, and, believing that to be the meaning of the language used, fraudulently concealed it from appellee's vice-president, and by such inequitable conduct induced the latter to enter into the contract while in the belief that the clause limited the traffic the former company could handle in its trains to pine logs. Upon such proof the court had jurisdiction to reform the contract. 4 Pomeroy, Eq., § 1376; *Id.* 847; 136 Fed. 661; 146 Ind. 340; 117 N. W. 775; 64 S. W. 336; 57 Minn. 337; 192 Pa. St. 21; 69 Atl. 533; 29 Ga. 168; 64 S. W. 406; 34 Cyc. 920 *et seq.*; 69 Ark. 406; 136 Fed. 661.

The admissibility of parol evidence is not to be determined upon the grounds contended for by appellant; for the question at issue here is the reformation of the contract; and,

to determine whether it should be reformed or not, parol evidence is admissible to determine what the contract is and the circumstances of the parties entering into it. The exception is as well established as the rule against the admission of parol evidence to vary written instruments. 2 Pomeroy, edition of 1886, § 858.

2. All intendments are in favor of the chancellor's finding, and it will be sustained unless clearly against the preponderance of the evidence. 67 Ark. 200; 73 Ark. 489; 89 Ark. 318.

FRAUENTHAL, J. This is an action instituted by the appellee to enjoin the appellant from proceeding to arbitrate a matter of dispute in reference to a certain traffic contract entered into and executed by both parties, and to reform said contract. Both parties are railroad corporations, organized under the laws of the State of Arkansas. Appellee owns and operates a line of railroad extending through White, Cleburne and other counties of the State, and the appellant owns and operates a railroad extending from Doniphan to Searcy, a distance of about six miles, where it connects with the main line of appellee's railroad, and also a spur line extending from appellee's main line at or near Letona out for a distance of eight or ten miles in Cleburne County. The principal corporators of the appellant company are also the principal corporators of a corporation known as the Doniphan Lumber Company, which operates a mill at Doniphan, and owns large bodies of timber lands situated chiefly in Cleburne County.

The principal property carried by the appellant over its line of railroad is pine logs, which it transports from the said timber lands in Cleburne County to the mill at Doniphan, where it is manufactured into the finished product, which is shipped out over its line. The appellant also carries over its railroad merchandise and supplies both to Doniphan and to points on its spur line extending out from Letona, where camps are located in cutting the timber.

On June 6, 1910, the parties to this suit entered into a written contract by which appellee granted to appellant certain trackage rights over its line of railroad. The provisions of said contract which we think are material in determining the questions involved in this case are as follows:

"Article 1. The Arkansas Company (appellee) hereby grants to the Doniphan Company (appellant) for a period of ten years from and after January 1, 1911, the joint and equal use, in common with the Arkansas Company and such other company or companies as the Arkansas Company shall at any time permit to use the same or any part thereof, and, subject to the conditions, limitations and restrictions in this contract set forth, of the main line and passing tracks of said railroad between the present connection of the tracks of the Arkansas Company and the Doniphan Company at the town of Searcy, White County, Arkansas, and a point three miles north of the water tank at Snell, as now located, in the county of Cleburne. * * *"

"Article 2. The Doniphan Company covenants and agrees to pay to the Arkansas Company * * * for the rights and privileges herein granted the sum of one dollar per mile for each and every mile its trains move over the tracks of the Arkansas Company. * * *"

"Article 4. The Doniphan Company will handle no traffic, whether passenger, freight, mail and express, or of any other character, to or from Searcy or the aforesaid point three miles north of water tank at Snell, or to or from any point between Searcy and the aforesaid point three miles north of water tank at Snell, except pine logs for manufacture at Doniphan, Arkansas; but, if legally compelled to do so, they shall pay to the Arkansas Company sixty per cent. of the Arkansas Company's local rate applying thereon. * * *"

"Article 5. The Doniphan Company hereby assumes all risk of all loss, damage or injury which shall in any manner occur in or upon any track the use of which is hereby granted, whether to the property of the Doniphan Company or to the property in its custody, or to its passengers or to its employees or to third persons, or to the property of third persons, shall there suffer by reason of the movement of any engine, car or train of the Doniphan Company, in all respects as if the Doniphan Company had then been in the exclusive use and control of such track. * * *"

There was also a provision in the contract providing for an arbitration in event any disagreement arose between the

parties concerning the construction of any part of the agreement  or the business or manner of transacting same.

In proceeding under this contract, a disagreement arose between the parties as to the kind of traffic which appellant was entitled to carry over  the appellee's tracks and the compensation which should be paid therefor.  The appellee contended that at the time said contract was executed it was intended and agreed that the trackage rights granted were limited and restricted to a certain class or character of traffic, towit, pine logs, and that this portion of the agreement was incorporated in the above article 4.  The appellant, however, contended that under the terms of said contract it was not limited or restricted in the kind or class of traffic that it might handle over appellee's rails, except as to such traffic originating or terminating on appellee's line of railroad at or between the points named in said article 4.  It claimed that it could transport over appellee's line any class or character of traffic which originated on its own line of railroad, for example, at Doniphan, or at the terminus of the spur extending out from Letona, and that for such traffic it was under obligation to pay only one dollar per mile for each mile its trains ran over the appellee's tracks, as provided in the contract.  Thereupon, appellant gave notice to appellee that it desired to arbitrate the question of the construction of the contract in this particular, under the terms of the contract providing therefor, and selected its arbitrator.  The appellee then instituted this suit, seeking to enjoin said arbitration, and to reform the contract if it does not express the intent and agreement as contended for by it.

In its original complaint, appellee based its right to a reformation of the contract upon the ground that a mutual mistake had been made by the parties in the employment of language to express the intent and agreement.  After all the testimony had been taken in the case, the appellee filed an amendment to its complaint in which it based its right to reformation upon the further alleged ground that the appellant, by inequitable conduct and fraudulent concealment of its interpretation or construction of the contract, induced appellee to execute it under a mistaken belief as to its meaning in this particular.

Upon the filing of the complaint, the chancellor issued a temporary injunction restraining the appellant from prosecuting the arbitration; and, on final hearing of the case, the court entered a decree reforming said contract so as to authorize appellant to handle in its trains operated over appellee's line of railroad pine logs, and no other traffic, and making perpetual the temporary restraining order.

Before considering the question as to whether or not the contract should be reformed, we think it necessary to determine whether or not the contract as written restricts and limits the kind and character of traffic to be handled by appellant over the appellee's rails to pine logs, no matter where such traffic may originate; for, if it does, then the decree of the chancellor would not be prejudicial to appellant, even though appellee was not entitled to the reformation, because, as reformed by the chancellor, the contract would simply express in more explicit language the agreement which the contract as written really makes.

There are a number of articles and provisions contained in this contract, and in making a construction of any one of its terms it is necessary to take into consideration the whole contract and every provision thereof. The general rule is that in arriving at the intention of the parties all parts of the contract must be considered and the terms and provisions of each part must be read and interpreted in the light of all other parts. *Earl* v. *Harris,* 99 Ark. 112; *Read's Drug Store* v. *Hessig-Ellis Drug Co.,* 93 Ark. 497; *Ayers* v. *Heustess,* 94 Ark. 493; *Johnson* v. *Wilkerson,* 96 Ark. 320.

Viewing the entire contract in this manner, we find that by article 1 the appellee granted to appellant joint and equal use of its main and passing tracks between the town of Searcy and a point three miles north of Snell, subject only to any limitation or restriction specifically named in the contract. By virtue of this provision, the appellee was given the right to handle any and every kind of traffic over said tracks, with no exception specifically named in this article, and with the exception only of such traffic as might be specifically named in other parts of the contract. For this service, the appellant agreed to pay the sum of one dollar per mile for each mile its trains moved over these tracks, and the length of the trains

is specifically named; but no limitation is made of the character of traffic to be handled in such trains. By article 5 of the contract, it is provided that the appellant assumed all loss or damage which might occur on such tracks to "the property of the Doniphan company or to the property in its custody, or to its passengers or to its employees or to third persons, or to the property of third persons, by reason of the movement" of appellant's engines and cars over said tracks. It will thus be seen that the parties provided that appellant should pay all damages for loss or injury to property transported by it, and to passengers carried by it, over said tracks. The parties did not restrict the damage which appellant would be required to pay for injury to or loss of pine logs, or even to property of appellant, but required it to pay for any damage arising from the injury to or loss of all freight and to passengers carried by appellant in its trains over said tracks. This would indicate that the parties understood and agreed that traffic other than pine logs would be handled and carried over these tracks by appellant. To avoid this plain meaning of this provision, counsel for appellee urge that the testimony shows that, in drafting the contract, a form of contract generally used by railroad companies in making agreements relative to joint trackage rights was copied, and was not in all of its provisions applicable to the condition of the parties in this case, and for that reason it was not meant that all such provisions should apply to them. In other words, it is claimed, as we understand, that some of the terms of this provision should be deemed as mere surplusage. But the rule of law firmly established is that no word in a contract should be treated as surplusage and disregarded if any meaning which is reasonable and consistent with the other parts can be given to it. *Childress* v. *Foster*, 3 Ark. 258; *Vaugine* v. *Taylor*, 18 Ark. 65; *Kelly* v. *Dooling*, 23 Ark. 58; *Railway* v. *Williams*, 53 Ark. 58.

None of the terms of this article 5 is inconsistent with the other provisions therein, or with the other parts of the contract. The contract, as written and executed, is the contract of the parties, no matter from what source they obtained the language upon which they agreed, or the form which they adopted. The kind of traffic mentioned in this article, whether

passengers or freight, is the kind for which appellant assumed all liability for damage which such traffic sustained while in its trains on said tracks. It therefore follows from this provision that it was contemplated by the parties at the time of the execution of the contract that the appellant would be entitled thereunder to carry in its trains over said tracks passengers and freight other than pine logs. Article 4 of the contract provides the only limitation placed on the class of traffic, and limits that traffic to pine logs when carried to or from certain specified points, and therefore originating at one of these specified points. It does not by express language or by plain intendment limit the kind of traffic to pine logs when such traffic originates or is carried to or from other points than those expressly named. Considering, then, the entire contract, and endeavoring to give effect to each and all its parts, we are of the opinion that it does not restrict or limit the traffic carried by appellant's trains over appellee's tracks to pine logs, when such traffic originates or is carried to or from points other than those specifically named in said article 4. While counsel for appellee do not concede that this is the correct construction of this contract, still their chief contention is that the contract should be reformed.

It is well settled that equity has jurisdiction to reform a written contract when there has been a mutual mistake, or where there has been a mistake by one party and fraud practiced by the other party inducing the execution of the contract. 4 Pomeroy, Equity Jurisprudence, § 1376. But in all such cases the question is chiefly one of fact, rather than of law. The mistake must exist in the agreement and be mutual—that is, by the mutual mistake of all the parties the instrument as written does not fulfill the manifest intention of the parties and does not conform to the agreement as made. It must be a mistake in omitting something which the parties intended inserting, or something which was a part of the agreement and which it was supposed was contained in the writing when it was signed and delivered. It must not be a mistake of judgment in that one party relied upon performance by the other of the provision omitted, instead of insisting upon its being reduced to writing and put in the written instrument. If the instrument is executed in con-

formity with the agreement as to the terms that were to be incorporated in it, then there is no mistake; and if it is in conformity with the intention of one of the parties, then there is no mutual mistake. *Hunt* v. *Rousmaniere*, 1 Pet. 1; *Ligon* v. *Rogers*, 12 Ga. 281; *Braun* v. *Wisconsin Rendering Co.*, 92 Wis. 245; *Wise* v. *Brooks*, 69 Miss. 891; *Weinhard* v. *Summerville* (Wash.) 89 Pac. 490.

In the case of *Goodrum* v. *Merchants & Planters Bank*, 102 Ark. 326, we said: "To entitle a party to reform a written instrument upon the ground of mistake, it is essential that the mistake be mutual and common to both parties; in other words, it must be found from the testimony that the instrument as written does not express the contract of either of the parties. It is also necessary to prove such mutual mistake by testimony which is clear and decisive before a court of equity will add to or change by reformation the solemn terms of a written instrument." *Varner* v. *Turner*, 83 Ark. 131; *McGuigan* v. *Gaines*, 73 Ark. 614.

In all such cases, the question is, not what the parties would have intended but for a misapprehension, not what the parties would have intended had they known better, but, rather, did the parties understandingly execute the instrument, and does it express their intention at the time, informed as they were? Courts of equity will not reform a contract on the alleged ground of mistake when subsequent events show that something desired was omitted. Such courts may compel parties to execute their contracts, but can not make contracts for them. They may correct an instrument so as to make it conform to the agreement, but they can not correct bad judgment or the result of inattention or carelessness. The evidence to show that a mutual mistake has been made in a written instrument, or that a mistake has been made by one of the parties and that such party has been induced to execute the instrument through the fraud of the other, must be clear and strong. This court has repeatedly held that such proof must be clear, unequivocal, convincing, and beyond reasonable controversy.

In the case at bar, viewing the evidence in its most favorable light to the cause of the appellee, there is a conflict as to whether or not the contract as written and signed expressed

the intention and agreement of the parties at the time of its execution.  After it had been drafted, it was forwarded to the vice-president of appellee's company and by him carefully examined, section by section.  He thereupon suggested several changes, some of which were in said article 4.  Thereupon a draft of the contract was placed before a committee composed of directors of appellee's company, who went over it carefully, in the presence of and with the counsel of its said vice-president.  Later, the draft was submitted to the representative of a corporation holding the bonds of said company, and he carefully examined and considered it.  Finally, after changes were made in the draft of the contract by those representing the appellee, it was approved by those various officers, agents and representatives, and then signed and executed by its vice-president.

If we can say from this testimony that the appellee's officers made a mistake in the language employed in the contract to express their intention, and really did, out of a lack of care, omit some portion or term which they desired incorporated therein, we think the testimony more clearly and convincingly shows that no such mistake was made by the president of appellant's company, who negotiated and executed this contract on its part.  He testified positively that he did not intend or agree that a restriction or limitation should be made on the kind or character of traffic other than that expressly named in the written instrument.  In conferences had by him with other officers of his company prior to the signing of the contract, it appears that he and these officers understood that this written instrument did not limit the character of traffic originating at and carried from one point to another on appellant's line of railroad, but that any kind of traffic originating at such points could be carried over its line and over the appellee's tracks.  So that, instead of the evidence being strong, unequivocal and beyond reasonable controversy that a mutual mistake was made, we think that there is convincing evidence that there was no mistake made on the part of one of the parties to the contract.

Nor do we think that the evidence is clear and convincing that any of appellant's officers practiced fraud or was guilty of inequitable conduct by which appellee was induced

to execute the contract, even if it should be found that appellee executed the contract under what we can say in law was a mistake. The basis for this charge of fraud is that, during the negotiations between the parties leading up to the execution of the contract, the president of appellant's company wrote to another officer of his company enclosing a copy of the contract and telling him that he understood that the contract made no restrictions on the class of traffic except between the points specifically named in article 4, and asking his opinion as to the meaning of the contract. In the letter he wrote him to "read it over carefully, without commenting on it to anybody." It appears also that appellant's president conferred with its counsel relative to the true meaning and construction of the contract and said article 4; but it is is not claimed that any of appellant's officers by any statement or act caused appellee to refrain from fully examining and informing itself relative to every provision of this contract and seeking any counsel or advice it desired. The means of information relative to the meaning of the language of this contract and its true construction were open to both parties alike. In fact, the draft of the contract was considered and carefully examined by appellee's officers on several different occasions, and changes were made therein by them. It can not be said that the evidence is clear and convincing that the appellee was induced to sign this contract by anything done or said by appellant's officers. On the contrary, the evidence preponderates in showing that the appellee acted entirely independently of, and uninfluenced by, any word or conduct on the part of appellant in the execution of this contract.

A few days before the execution of the contract, Mr. Carter, the president of appellant's company, and Mr. Sands, the vice-president of appellee's company, who were the moving spirits in behalf of their respective companies in the negotiation and execution of the contract, discussed the various terms of the written draft looking to a final consummation of the agreement. In the course of that interview, they spoke with reference to what class or kind of traffic could be handled under the terms of the proposed contract. Mr. Carter testified that Mr. Sands remarked that under the proposed contract appellant could not haul anything but pine logs,

and that he replied that Mr. Sands was mistaken, and in effect that appellant under the proposed contract was not thus restricted. Mr. Sands testified that Mr. Carter remarked that the proposed contract gave appellant the right to handle anything, and that he promptly and definitely replied that it did not. He also stated that he thought Mr. Carter spoke jokingly, and made his remark in an interrogating manner. While there is a slight conflict in the testimony of these witnesses as to the exact words of the conversation, the evidence clearly shows that before the execution of the contract appellee knew the construction placed by appellant upon the agreement and its understanding of it.

It can not be said, in the light of this evidence, that appellant induced any action on the part of appellee, either by any word or act, or by the suppression of its understanding of the agreement. Some days later the contract as thus drafted was executed. Under these circumstances we can not say that any fraud or inequitable conduct was practiced by appellant to secure the execution of this contract by appellee. It clearly appears that the parties were dealing with each other at arm's length and trying to get for their respective companies the best and most favorable contract possible. Here there was no relation of trust or confidence existing between the parties.

In the case of *Cherry* v. *Brizzolara*, 82 Ark. 309, it is said: "This court has said that when the means of information are open to both parties alike, so that by ordinary diligence and prudence each may be informed of the facts and rely upon his own judgment in regard to the thing to be performed or the subject-matter of the contract, if either fails to avail himself of the opportunity, he will not be heard to say he has been deceived. A court of equity will not undertake to relieve a party from the consequences of his own inattention and carelessness.".

During the negotiations, it appears that appellee wrote to appellant stating several terms which it desired incorporated in the contract. Amongst these it stated that the class of traffic should be limited to pine logs. Appellee claims that this referred to every kind of traffic that appellant might carry over said tracks, and was the actual agreement arrived at.

Appellant, however, contends that appellee then had before it the draft of the contract, and was writing only relative to said article 4, in which the draft at that time permitted traffic in logs between the points therein designated, and that by this letter the appellant only insisted that it be limited to pine logs between said points, instead of every kind of logs.

But, in whatever view we consider these conflicting contentions, it clearly appears that this letter was only a part of the negotiations leading up to the consummation of the agreement and the execution of the contract. As has been said by this court: "Antecedent propositions, correspondence and prior writings, as well as oral statements and representations, are deemed to be merged into the written contract which concerns the subject-matter of such antecedent negotiations, when it is free of ambiguity and complete." *Barry-Wehmiller Machine Co.* v. *Thompson,* 83 Ark. 283.

We have carefully examined the evidence in this case, and, viewing it in the light most favorable to appellee, it can be only said that the evidence is conflicting, both as to whether or not the contract as finally written and executed represents the agreement and intention of the parties, and whether or not any mistake was made in the language employed to give expression to that agreement; and, also, that it is conflicting as to whether or not the appellant, even if the language does not express the intent and agreement of appellee, by any fraud or inequitable conduct, induced its execution by appellee. The evidence to sustain either of these propositions is not clear, decisive and convincing, as demanded by the law before there can be a reformation.

Upon the appeal of a chancery case to this court, it is tried *de novo.* While the findings of the chancellor as to questions of fact are persuasive, they are not conclusive; and where they are made upon testimony which is conflicting, but which, under the law, must be clear, convincing and beyond reasonable controversy, and the evidence is not of that probative force, it becomes our duty to set the findings aside. *Mitchell* v. *Kempner,* 84 Ark. 349. The language employed in this contract is not different from that appearing in any written instrument concerning the effect of which the contracting parties may differ. The parties may resort to the

courts for its construction, but on that account it is not necessarily vague or ambiguous. When properly considered, the language employed in this contract is plain and unambiguous. With every means of information open to them, the parties signed and executed this written instrument, which then became a binding contract, which can not be altered, varied or added to. If some provision has been omitted without mutual mistake or fraud, the law can not supply such omission; the courts can not incorporate into a written instrument what the parties left out of it, but must leave the written contract just as the parties made it.

The decree of the lower court is therefore reversed, and this case is dismissed for want of equity.