## RUSSELL et al. v. SHELL PETROLEUM CORPORATION.

### No. 792.

Circuit Court of Appeals, Tenth Circuit.

July 31, 1933.

Rehearing Denied Aug. 22, 1933.

A. M. Cowan and Mark H. Adams, both of Wichita, Kan. (W. E. Holmes and Howard L. Baker, both of Wichita, Kan., on the brief), for appellants.

John M. Holmes, of St. Louis, Mo. (Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., on the brief), for appellee.

Before LEWIS and PHILLIPS, Circuit Judges, and POLLOCK, District Judge.

PHILLIPS, Circuit Judge.

This is an appeal from a decree reforming an oil and gas lease.

The material facts are these. Prior to 1910 Benjamin H. Russell and Nathan W. Russell jointly owned the Northeast Quarter of Sec. 23, Twp. 19 South, Range 2 West, McPherson County, Kansas, subject to easements for two railroad rights of way. These rights of way covered the south 10 acres of the quarter section. In 1910 the Russells partitioned the 150 acres lying north of the rights of way. Benjamin received the north 70 acres of the south half and the south five acres of the north half of the quarter section. Nathan received the north 75 acres of the north half of the quarter section. The 10 acres burdened with the rights of way easements continued in their joint ownership. The ownership, after the partition, more graphically appears from the plat set out in note 1.[1]

The description in the partition deed from Nathan to Benjamin reads as follows:

"All of our undivided interest and title in and to the following described land to-wit: Commencing at the fence of the Chicago, Rock Island Railway Company on the North line of said Right of Way, thence North Seventy-five rods (75) thence West to the line fence One Hundred and Sixty rods or more, thence South to the fence of the Chicago Rock Island Railway Company on its North line of the right of way Seventy-five rods, (75), then due east 160 rods or more to the place of beginning; the same to contain Seventy-five acres, more or less, *and being the South one-half of the Northeast Quarter of Section Twenty-three* (23) in Township Nineteen (19) South of Range Two (2) West 6th P. M. lying North of the Chicago Rock Island Railroad right of way."

The error in the italicized portion of the description resulted in a misconception by

the Roxana Corporation as to the ownership of such quarter section.

In February, 1926, the Roxana Corporation, now the Shell Petroleum Corporation, was acquiring a block of oil and gas leases in the vicinity of the Russell land. Kirkbride, its leaseman, understood that Benjamin owned the south half and Nathan the north half of the quarter section. He acquired for the Roxana Corporation an oil and gas lease from Nathan covering the north half. The description in this lease included the south 5 acres of the north half owned by Benjamin. Thereafter Kirkbride, believing that he had acquired from Nathan a lease of the north half, negotiated with Benjamin for a lease on the south half, and pursuant thereto Benjamin and Emma L. Russell, his wife, executed a written lease on the south half to the Roxana Corporation, dated February 4, 1926, for a term of five years. Benjamin received therefor, in addition to the other consideration, a bonus of $80.

Kirkbride testified in part as follows:

"We then went to the home of Benjamin H. Russell, and told him we were taking a block for Roxana and had leased his brother's piece and wanted to lease his and were paying $1.00 an acre bonus and $1.00 a year rental for a five year commercial lease, which he said was satisfactory. He accepted the proposition. The lease was written and executed, and check for $80.00 delivered. * * * I wrote out the lease there. *I told him I wanted to lease the South Half of the Northeast Quarter, and that is what was leased.*"

The oral negotiations were with respect to the south half, and the land was so described in the lease. As far as Kirkbride was concerned, the lease contract evidenced exactly what he intended. With respect to Benjamin and Emma, it may not have evidenced what they intended. The evidence in that respect is conflicting. They made an affidavit that both in the original lease and in the renewal lease, hereinafter referred to, they intended to lease all the land they owned in the quarter section.

G. F. Gratton testified that he had a conversation with Benjamin and Emma in August, 1931, in which both stated they intended to lease all of their land.

Emma testified, with reference to the Kirkbride negotiations, as follows:

"When Mr. Kirkbride came in 1926, he said he wanted to lease the south eighty. I

---

[1]

Nathan W. Russell's
75 acres

Benjamin's 5 acres

Benjamin H. Russell's
70 acres

Joint ownership 10 A.

could not say for sure but I guess he said he wanted to lease my husband's land in that section. * * * He asked for the south eighty, and I supposed he put that description in the lease. When he first talked about the south eighty, I had in mind the land we owned in the quarter section. Except when we want to be technical, we generally refer to our land as the south 80. After he left I found out that the lease didn't describe the land we actually owned."

Benjamin testified:

"He (Kirkbride) said: 'Your land is the south half of that quarter.' I told him my land was not a full eighty, and he said we do not pay any attention to railroads, make no exceptions; said he wanted to lease the South Half of the Northeast Quarter. Accordingly the lease was executed. There was nothing said about the five acres I owned in the North Half of the Northeast Quarter. * * * We were not trying to slip anything over on the Shell's representative, but were just withholding the five acres. Didn't say anything about it. We told them the eighty was a short eighty, and they said they made no exceptions to the railroad. We did not tell them about the five acre strip. It was their own fault if they didn't know about it. I thought Shell had slipped up on that five acres; that they had missed it. I didn't intend to enlighten them, but it seems like they were enlightened about it some other way. We thought we were getting payment for five acres more than we were entitled to. * * * At the time Shell wanted to make their lease, they told me that they had leased my brother's land and wanted to lease my half of the quarter section. I told them mine was a short half, and they said they didn't except the right of way, that they took that. I explained nothing in regard to the five acres. I was paid $10.00 an acre, amounting to $800.00, for the renewal lease and $1.00 an acre for the original lease. As a matter of fact, I only owned about seventy-five acres, and didn't tell them anything about the five acres."

In 1930, Welsh, superintendent of the Shell Corporation at Wichita, offered Benjamin a $10 per acre bonus for a renewal lease. Oglesby, a leaseman under Welsh, continued the negotiations with the intention of procuring leases on the entire quarter section, still believing that Nathan owned the north half and Benjamin the south half thereof. An agreement was reached and renewal leases were executed, dated April 1, 1930, carrying the same descriptions as the original leases, and running for the term of two years from February 4, 1931, and as long thereafter as oil or gas should be produced from the land. Benjamin and Emma received a bonus of $800 for their renewal lease. The decree reformed such lease to include the 5 acres owned by Benjamin in the north half.

On the issue of reformation the court found that it was the intention of Benjamin and Emma, and the Roxana Corporation, in the transaction of February 4, 1926, to lease all of Benjamin's land, but through mutual mistake of fact the lease, as drawn and executed, covered only his land in the south half. The court further found a like intention and mutual mistake with respect to the lease of April 1, 1930, to the Shell Corporation. The evidence, in our opinion, fails to support these findings. Kirkbride believed, when he entered into negotiations with Benjamin, that Benjamin owned the south half. He had already acquired a lease purporting to cover the north half. His negotiations with Benjamin related particularly to the south half. Kirkbride, Benjamin, and Emma testified that Kirkbride stated definitely that he wanted to lease the south half. Hence the written lease evidenced the identical land specifically designated in the preliminary oral agreement. Kirkbride undoubtedly wanted to lease all the land owned by Benjamin in the quarter section, but he erroneously believed that Benjamin owned land only in the south half. Due to this misconception, he contracted with Benjamin in respect of the south half only, both in his oral negotiations and in the written contract. In other words, a mistake as to facts extrinsic to the oral negotiations and the contract led Kirkbride to make a contract which he would not have entered into had he understood the true facts, but the contract as written was exactly as he intended it to be; it expressed the very terms he intended.

█ Where an agreement has been made or a transaction entered into or determined upon as intended by the parties, but either through the mutual mistake of the parties, or through a mistake of one accompanied by a fraudulent knowledge and procurement of the other, the written instrument fails to express the real agreement or transaction, equity may grant reformation. Columbian Nat. Life I. Co. v. Black (C. C. A. 10) 35 F. (2d) 571, 71 A. L. R. 128; Southern Surety Co. v. U. S. Cast Iron Pipe & F. Co. (C. C. A. 8) 13 F. (2d) 833; Pomeroy's Eq. Juris. (4th Ed.) Vol. 2, § 870.

■■ To justify reformation on the ground of mistake, the mistake must have been made in the drawing of the instrument and not in the making of the contract which it evidences. Robinson v. Korns, 250 Mo. 665, 157 S. W. 790; Curtis v. Albee, 167 N. Y. 360, 60 N. E. 660. A mistake as to the existing situation, which leads either one or both of the parties to enter into a contract which they would not have entered into had they been apprised of the actual facts, will not justify reformation. It is not what the parties would have intended if they had known better, but what did they intend at the time, informed as they were.[2]

Williston on Contracts, vol. 3, § 1549, states the rule as follows:

"If, because of mistake as to an antecedent or existing situation, the parties make a written instrument which they might not have made, except for the mistake, the court cannot reform the writing into one which it thinks they would have made, but in fact never agreed to make."

■ The Roxana and Shell corporations erroneously believed that Nathan owned the north half and Benjamin the south half of the quarter section. They believed that Nathan owned the south 5 acres of the north half, when in fact Benjamin owned that part of the land. Had they not been mistaken as to the ownership of the south 5 acres of the north half, they no doubt would have undertaken to contract with Benjamin for a lease which would have included such 5 acres; but they did not. On the contrary the evidence clearly established that they intended to contract, and actually did contract, for leases of the south half from Benjamin. The Shell Corporation here seeks to have the court write such a contract as it probably would have written had it not been mistaken as to the extrinsic facts. There was no mistake in evidencing the terms of the contract. The sole mistake was as to existing facts, which were extrinsic to the oral negotiations and the lease. Such a mistake affords no ground for reformation.

■ Furthermore, it is a settled principle that the mistake must be mutual. Strutzel v. Richardson, 136 Wash. 485, 240 P. 682; McMillon v. Town of Flagstaff, 18 Ariz. 536, 164 P. 318. The only mistake in the instant case was with respect to the ownership of the south 5 acres of the north half of the quarter section. Kirkbride erroneously believed that such 5 acres was owned by Nathan. Benjamin and Emma did not share in such mistake; they both knew such 5 acres belonged to Benjamin. Therefore the mistake was un-

[2] Pittsburg Lbr. Co. v. Shell, 136 Tenn. 466, 189 S. W. 879; Charles v. McClanahan et al., 130 Va. 682, 108 S. E. 858; Mighill v. Inhabitants of Town of Rowley, 224 Mass. 586, 113 N. E. 539; Lyons v. Chafey, 219 Mich. 493, 189 N. W. 86; Curtis v. Albee, 167 N. Y. 360, 60 N. E. 660; Hammer v. Lange, 174 Ala. 337, 56 So. 573; Webster v. Stark, 10 Lea (Tenn.) 406; St. Anthony Falls Water Power Co. v. Merriman, 35 Minn. 42, 27 N. W. 199; Wise v. Brooks, 69 Miss. 891, 13 So. 836; Strutzel v. Richardson, 136 Wash. 485, 240 P. 682; Crawford v. Willoughby, 192 N. C. 269, 134 S. E. 494; De Voin v. De Voin, 76 Wis. 66, 44 N. W. 839; Frost v. Reagon, 32 Okl. 849, 124 P. 13, 14; Doniphan, K. & S. R. Co. v. Missouri & N. A. R. Co., 104 Ark. 475, 149 S. W. 60, 64.

In Frost v. Reagon, supra, the court said:

"It is only where there is a mutual mistake that the court has the power to reform a contract. In case of Wise v. Brooks, 69 Miss. 891, 13 So. 836, the court said: 'It is doubtless that, but for misapprehension as to the extent of the operation of the deed to Rowe, the parties would have proceeded differently; but that is not the question for equity to consider in a proceeding to reform contracts. It is not what the parties would have intended if they had known better, but what did they intend at the time, informed as they were.' In the case of Webster v. Stark, 10 Lea (Tenn.) 406, the court said: 'The mistake was not in the contract, or in the writing embodying the contract, but of an extrinsic fact, which fact, if known, would probably have induced the parties to make a different contract. The mistake, such as it was, was the mistake of the complainant, and there is nothing to fix the defendant with any fault in the premises. The written instrument drawn up by him embodies the contract of the parties exactly as it was entered into. There is no ground for interfering with it in any way.' Pomeroy's Equity Jurisprudence, § 870, states the rule as follows: 'Reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties.' Equity will not, under the guise of reforming a contract, make a new contract not in contemplation of either party. To reform the contract so as to limit the plaintiff to 6½ inches on lot 35 would be to make a contract different to that which he intended to make, a contract which from all the circumstances of the case it is not likely he would have made had he known that lot 35 extended further south than both parties believed it did at the time it was made."

In Doniphan, K. & S. R. Co. v. Missouri & N. A. R. Co., supra, the court said:

"In all such cases, the question is not what the parties would have intended but for a misapprehension, not what they would have intended had they known better, but rather, Did the parties understandingly execute the instrument, and does it express their intention at the time, informed as they were? Courts of equity will not reform a contract on the alleged ground of mistake when subsequent events show that something desired was omitted. Such courts may compel parties to execute their contracts, but cannot make contracts for them. They may correct an instrument so as to make it conform to the agreement, but they cannot correct bad judgment or the result of inattention or carelessness."

ilateral. Under such circumstances reformation will not be granted.

Counsel for the Shell Corporation assert that the failure of Benjamin to disclose his ownership of the south 5 acres of the north half amounted to a fraud upon it, and that such fraud, coupled with the mistake on its part as to the ownership, entitles it to reformation. Whether such nondisclosure by Benjamin amounted to a fraud upon the Shell Corporation, need not be decided. While fraud perpetrated to induce a contract may be ground for its cancellation or rescission (Spexarth v. Rhode Island Ins. Co., 118 Or. 22, 245 P. 515; Long v. Greene County A. & L. Co., 252 Mo. 158, 158 S. W. 305), fraud to authorize reformation must be fraud whereby the terms of the contract are suppressed or misrepresented so that the instrument executed does not accurately state the contract actually made. Harding v. Robinson, 175 Cal. 534, 166 P. 808; Spexarth v. Insurance Co., supra; Long v. Greene County, supra. Assuming such nondisclosure was fraud, it was fraud coupled with a mistake as to an extrinsic fact and it did not result in the written instrument failing to state accurately the contract actually intended and made. Under such circumstances a court of equity may not impose upon the parties, by a decree of reformation, a contract different from that which they actually agreed to, and made.

Reversed with directions to vacate the decree and dismiss the bill.