AMERICAN SOUTHERN TRUST COMPANY *v.* McKEE.

Opinion delivered February 14, 1927.

1. BANKS AND BANKING—GOOD FAITH IN LOAN AGREEMENT.—The fact that a bank's condition was such that collections could not be made without great difficulty and disastrous results to borrowers does not tend to show that the bank acted in bad faith in agreeing to employ a certain agent to look after its collateral for creditor banks which were to make further advances.

2. BANKS AND BANKING—LOAN AGREEMENT.—Creditor banks had a right to enter into a contract with a debtor bank whereby they agreed to lend it additional money if it would employ a certain agent to look after the making of loans and collecting collateral.

3. BANKS AND BANKING—LOAN AGREEMENT.—A bank heavily indebted to two other banks was authorized to agree to carry its cash balance with such other banks, in consideration of their making additional loans to it.

4. BANKS AND BANKING—LOAN AGREEMENT.—A contract whereby creditor banks made further advances to a debtor bank, sent their agent to protect their interests, and required the debtor bank to keep its cash deposits with them, cannot be construed as authority to take over the debtor bank, or to control and manage same.

5. CONTRACTS—MERGER OF ORAL INTO WRITTEN AGREEMENT.—Prior oral agreements forming a part of the negotiations for a contract became merged in a subsequent written contract, and are incompetent in evidence for the purpose of enlarging the scope of such written agreement.

6. EVIDENCE—PAROL EVIDENCE RULE.—A written contract, free from doubt and ambiguity, cannot be altered or contradicted by parol evidence, except for fraud or mistake.

7. CONTRACTS—MODIFICATION.—Parties to a written contract may, subsequent to its execution, modify it and substitute a valid oral agreement therefor.

8. PRINCIPAL AND AGENT—PROOF OF AGENCY.—Neither agency nor the extent of an agent's authority can be proved by his declarations or actions.

9. PRINCIPAL AND AGENT—AUTHORITY OF AGENT.—Acts and declarations of an agent which were beyond his authority as contained in a written contract, are not binding on his principal.

10. PRINCIPAL AND AGENT—APPARENT AUTHORITY OF AGENT.—A principal is liable for the acts of an agent, though not authorized, if they were within the apparent scope of his authority, which the principal knowingly permits the agent to exercise or holds him out as possessing.

11. PRINCIPAL AND AGENT—DUTY TO INQUIRE AS TO AUTHORITY.—One dealing with an agent without inquiring of the principal as to his authority does so at his peril, unless he knows of acts and declarations of the principal determining the agent's authority.

12. PRINCIPAL AND AGENT—ESTOPPEL OF PRINCIPAL BY AGENT'S ACTS. —A principal will not be estopped to deny his agent's authority unless he knows of the acts and declarations of the agent in excess of his express authority and not within his apparent authority.

13. PRINCIPAL AND AGENT—GENERAL AND SPECIAL AGENTS.—The powers of general and special agents are governed by the same principle, to-wit, they can do anything within the scope of their agency so as to bind their principal, though there may be secret instructions limiting their powers; but, whether the authority be general or limited, they cannot charge their principals if they exceed it.

14. PRINCIPAL AND AGENT—AUTHORITY OF GENERAL AGENT.—A general agent, unless he acts under special and limited authority, impliedly has power to do whatever is usual and proper to effect such purpose as is the subject of his employment.

15. PRINCIPAL AND AGENT—IMPLIED POWER.—The implied power of an agent, however general, must be limited to such acts as are proper for an agent to do, and cannot extend to acts clearly adverse to the principal's interests or for the benefit of the agent personally, nor to acts not usually done by agents in that sort of transaction.

16. PRINCIPAL AND AGENT—AUTHORITY OF SPECIAL AGENT.—The authority of a special agent must be strictly pursued, and those dealing with him must, at their peril, determine the extent of his authority.

17. PRINCIPAL AND AGENT—SCOPE OF AUTHORITY.—Where a principal permits a special agent so to act as reasonably to induce others to credit him with broader powers than he possesses, he will be estopped to deny the existence of as broad an authority as he permitted the special agent to exercise.

Appeal from Arkansas Chancery Court, Southern District; *H. R. Lucas*, Chancellor; reversed in part.

*Bryan, Williams & Cave, Coleman & Gantt* and *Coleman & Riddick* and *G. W. Botts,* for appellant.

*Floyd Wingo, Buzbee, Pugh & Harrison, Geo. C. Lewis, John L. Ingram, John W. Moncrief, Cohn, Clayton & Cohn, Peyton D. Moncrief* and *Rogers, Barber & Henry,* for appellee.

MEHAFFY, J.   This suit was begun in the Arkansas Chancery Court against the American Southern Trust Company of Little Rock, and others, seeking to recover against them for amounts due depositors, and also other creditors of the Bank of Gillette at the time said bank was closed.

The plaintiffs allege that the Bank of Gillette, on June 24, 1921, and for some years prior thereto, was engaged in the banking business in Gillette, State of Arkansas. H. S. Jones was president of the said bank; William Moll, J. W. A. Norden, A. H. Richter, J. I. Devore and Henry S. Jones constituted the board of directors, and J. W. A. Norden was secretary, and Roy Koen, cashier. It is alleged that the Bank of Gillette, on June 4, 1921, and for some time prior thereto, was largely indebted to the American Bank of Commerce & Trust Company and the First National Bank of St. Louis, Mo., and that the Bank of Gillette was insolvent, and that said insolvency was known by the American Southern Trust Company and the St. Louis bank, and that said Bank of Gillette was unable to pay indebtedness to said banks, and, in order to prevent the loss of said indebtedness, the American bank and St. Louis bank, in order to attain their preference over the other creditors of the Bank of Gillette, entered into a conspiracy with the president and board of directors of the Bank of Gillette, and entered into the following illegal agreement with the president and board of directors of the Bank of Gillette:

"Minutes of special meeting of the board of directors of Bank of Gillette.

"Gillette, Ark., June 4, 1921.

"At a meeting of the board of directors, being a special meeting called by the president, the following resolution was read and adopted:

"Whereas, it becomes necessary that a certain agreement between the American Bank of Commerce of Little Rock, Ark., the First National Bank of St. Louis, Mo., the Bank of Gillette, Gillette, Ark., and Geo. F. Walz (a copy

of which agreement is attached hereto and made a part of these minutes) be entered into.

"Therefore be it resolved: That the president and secretary of this bank are hereby directed and authorized to enter into and execute the above mentioned agreement for and on behalf of this bank.

"Be it further resolved: That we, the undersigned officers and members of the board of directors, waive all formal and legal notice of this special meeting.

"Henry S. Jones, President.
"Wm. Moll, Director.
"J. W. A. Norden, Director.
"A. H. Richter, Director.
"A. J. Devore, Director.

"Attest: J. W. A. Norden, Sec.

"Approved this the 29th day of June, 1921. Henry S. Jones, president.

"Attest: J. W. A. Norden, Sec.

"Agreement between the First National Bank of St. Louis, Mo., and the American Bank of Commerce and Trust Company, Little Rock, Ark., concerning the handling of the Bank of Gillette, as arranged between Mr. Coffman of the First National Bank and W. A. Hicks of the American Bank of Commerce & Trust Co.

"It is understood between the two banks mentioned above that the Bank of Gillette is to employ Mr. Geo. F. Walz at a salary of $350 per month, Mr. Walz to serve as trustee for the two banks and represent them as the two banks may have agreed with the Bank of Gillette, expenses of Mr. Walz's employment to be paid by Bank of Gillette.

"It is agreed that the First National Bank of St. Louis, Mo., and the American Bank of Commerce & Trust Company, Little Rock, Ark., are to lend to the Bank of Gillette, during the year 1921, if it becomes necessary, an additional aggregate sum of $75,000, two-thirds of which is loaned by the American Bank of Commerce & Trust Company and one-third by the First National Bank.

"The Bank of Gillette is to carry its cash balances on deposit with the First National Bank of St. Louis and with the American Bank of Commerce & Trust Company of Little Rock, and with no other banks; balances to be carried on the basis of one-third with the St. Louis bank and two-thirds with the Little Rock bank. Mr. Walz, in representing the two banks, is to obtain from the Bank of Gillette all of the collateral which they own in the way of notes, etc., to secure money already advanced and money to be advanced by the two banks in question.

"It is also understood by the present officers of the Bank of Gillette and Mr. Walz is to have absolute authority in the granting of loans and accepting of collateral. No loans are to be made by the Bank of Gillette without first obtaining the approval of Mr. Walz.

"Notes for the money loaned to the Bank of Gillette are to be made payable to the banks advancing the money, and are to carry a maturity of 'on demand,' and, if not demanded, then Oct. 1, 1921.

"All collateral obtained on loans made to the Bank of Gillette is to be held in trust for the two banks advancing money as referred to above, and, in collecting the collateral, all money collected is to be applied on the indebtedness owing the two banks in proportion to the money advanced by the two banks, that is, one-third of the collections to go to the First National Bank and two-thirds to the American Bank of Commerce & Trust Company, as the collections are made. For matter of protection, however, the collateral is to be held in separate envelopes, one containing collateral securing the loan of the First National Bank of St. Louis, Mo., and other securing the loan of the American Bank of Commerce & Trust Company of Little Rock, Ark., it being understood that the margin of collateral over the amount of money loaned is to be the same, as nearly as possible. Should it occur, in making collections, that more of the collateral as held by one is paid than that as held by the other bank, it is understood that the payments will be distributed as referred to above, on the one-third and two-thirds basis,

and collateral transferred from one envelope to the other of sufficient amount to offset collateral that has been paid, so as to make the same proportion of margin.

"It is also understood that no contract has been entered into with Mr. Walz as to definite time of employment, but it is understood with the officers of the Bank of Gillette that Mr. Walz will be retained by them just as long as we desire him to remain, or until the indebtedness of the Bank of Gillette to the First National Bank of St. Louis, Mo., and the American Bank of Commerce & Trust Company of Little Rock, Ark., is paid in full.

"The above outline is hereby acknowledged to be understood and agreed to by all parties mentioned in this contract, viz., the First National Bank of St. Louis, Mo., the American Bank of Commerce & Trust Company of Little Rock, Ark., Geo. F. Walz, trustee for the First National Bank of St. Louis and the American Bank of Commerce & Trust Company of Little Rock, and the Bank of Gillette, by its president and cashier.

"First Nat'l. Bank of St. Louis,
"Frank A. Hicks, V. P.
"American Bank of Commerce & Trust Co.
"By W. A. Hicks, V. P.
"Bank of Gillette,
"Gillette, Ark.
"Geo. F. Walz."

Plaintiffs alleged that the object of the agreement was to secure the American and St. Louis banks an unlawful and illegal preference of other said creditors of the said Bank of Gillette; that, in pursuance of the said conspiracy to procure said illegal preference, the agreement and contract was kept secret, and that the other creditors had no knowledge of it. They allege that, in pursuance of said agreement, George F. Walz, as agent of the American and St. Louis banks, took charge of the entire assets of the Bank of Gillette, consisting of notes, cash, and other securities, and exercised absolute and exclusive control of the Bank of Gillette and its assets until some time in January, 1923, when the Bank of Gillette was closed by

the Bank Commissioner. They alleged that, at the time the bank was closed, their entire assets, except the fixtures, were in the hands of Walz as representative of the American Southern Trust Company and the St. Louis bank, and have not been delivered to the Bank Commissioner for the use and benefit of creditors of the Bank of Gillette; that the president and board of directors of the Bank of Gillette permitted said Walz to have complete and absolute control and absolute management of said Bank of Gillette from the 29th day of June, 1921, up to the time the Bank of Gillette was closed by the Bank Commissioner, and that said president and board of directors neglected and refused to exercise the care, supervision and control of the management of the said Bank of Gillette as are required of them as president and board of directors of said bank; that from June 29, 1921, until the time the bank closed, the Bank of Gillette was insolvent, and that its insolvency and the fact that its assets were turned to said Walz as agent for said banks were not divulged to the public at large, but that it was held out that said bank was solvent, was held open for deposits, although, as soon as deposits were made in said bank, they were immediately transmitted by Walz to the American Southern Trust and St. Louis banks, and that cash from all notes was transmitted, and that nothing was left in possession of the president and board of directors of the Bank of Gillette.

The First National Bank of DeWitt alleges that, relying on representations as to the solvency of the Bank of Gillette, as made and held out to the public by the defendants, it did advance to one Wm. Moll the sum of $4,329.12; that it was made to Moll with the understanding and agreement of the Bank of Gillette that said bank would guarantee the payment of funds so advanced to Moll for the benefit of said Bank of Gillette; that said advances are evidenced by promissory notes of Wm. Moll and the guaranty of the Bank of Gillette, signed by Henry S. Jones, president, and Norden, secretary; that no part of said sum has been paid, and that Moll is insol-

vent; that judgment has been taken against Moll, and
that it is uncollectable.   The Bank of DeWitt states that
it would not have advanced said sums except by guaranty
of repayment by the Bank of Gillette, and that said
guaranty would not have been accepted except for the
fact that the defendants had represented the Bank of
Gillette as being solvent; that, if it had known of the con-
trol of the American and St. Louis banks, it would not
have advanced the funds; that all legal means had been
used for collecting said sums from Wm. Moll, and that
payment had been refused by the Bank of Gillette; that,
during the time said George F. Walz had charge, large
sums of money were collected and transmitted to the
American and St. Louis banks, and that said banks were
holding the funds under the illegal contract above set out.
They state that the amount of $350 a month paid to Walz,
under the terms of the illegal contract, were illegal and
*ultra vires;* that, under the terms of the contract, Walz
was the agent of the American and St. Louis banks, and
had no right to divert the funds to pay himself; that the
president and board of directors of the Bank of Gillette
had no legal right to enter into the contract.

Suit was filed for the depositors of the Bank of
Gillette, setting forth specifically the amount due each.
Interventions of other creditors were filed.   The Ameri-
can Bank of Commerce & Trust Company filed separate
answers to the original complaint, and to the complaints
of all other parties, and also answer to the interventions.
The American Bank & Trust Company denied specifically
the allegations in the complaints and interventions, and
pleaded the statute of limitations, and admits that it
entered into the written agreement set out in plaintiff's
complaint, but denied that, under said agreement, it took
charge of the Bank of Gillette, or that it ever assumed the
complete supervision, direction and control of the col-
lateral of the Bank of Gillette, its assets, business and
affairs, to the exclusion of legal officials.   It denied that
it assured the Bank of Gillette that it would stay with it
and take care of it and pull the bank through; denied that

they operated the bank or caused it to be operated; denied that it kept said bank open by continuing and receiving deposits; and denied that it knew that the Bank of Gillette was unsafe for depositors; denied that it executed any outline agreement or arrangement to take charge of and operate and conduct the Bank of Gillette.

The directors of the Bank of Gillette filed answers and cross-complaints, but the real contentions of all of the parties seeking to recover against the American Southern Trust Company are that the contract authorized the American bank and St. Louis bank to take charge of and conduct the affairs of the Bank of Gillette, and that they were, in fact, operating it as a branch bank, and also that Hicks and Coffman told the directors of the Bank of Gillette that they would see them through, and that, under the contract entered into and these statements of Hicks and Coffman, the American Bank became liable to all depositors and all other creditors as if the Bank of Gillette had been operated by it as a branch bank, and that Walz assumed complete control of the Bank of Gillette and its affairs, to the exclusion of the board of directors of said bank, and that, if they were not liable because of these things, they still would be liable, it is contended, because they caused the Bank of Gillette to be kept open to receive deposits, and that this was unlawful, and deceived the public, and caused them to extend credit to the Bank of Gillette when they would not otherwise have done so. Testimony was taken by the plaintiffs and interveners for the purpose of showing that Walz was the representative of the American and St. Louis banks, and that, under their direction, and representing them, he exercised complete control of the Bank of Gillette and its affairs.

Some witnesses testified that they supposed Mr. Walz was managing the Bank of Gillette, and others testified about his conduct there, and about his declarations and action. Mr. Sanders testified that, after he became director, he supposed that Mr. Walz was managing the bank, and he testified at some length about Mr. Walz's

conduct and statements. It is also alleged that, not only Mr. Walz, but Mr. Sam Poe, was sent down to represent the American and St. Louis banks. The defendants introduced testimony then to show that Walz was not sent for the purpose of taking charge of the bank, but because the Bank of Gillette owed the American and St. Louis banks large amounts of money; that he was sent there, as the contract provided, to look after the loans and collateral; that, before they made the contract, they told the directors that they were inclined not to lend any more money, and that they had a conference with Mr. Jones, Mr. Norden and Mr. Koen, and stated to them that they would be willing to lend the bank more money under the arrangement suggested. The agreement was afterwards reduced to writing in the form of the contract set forth in the plaintiffs' complaint; that when Mr. Norden stated that, "We are at your will", Mr. Hicks stated to him, "I don't want you to feel that way. It is nothing to us whether you borrow from us or some one else. If the arrangement is not satisfactory, we don't want you to enter into it."

Mr. Norden then said it would be satisfactory. They then discussed the terms, and the Bank of Gillette was to give them all collateral, and they were to advance an additional $75,000, or as much thereof as was needed. That Hicks was to prepare the contract, and the said Norden asked him if Walz was to have charge of the bank or to have anything to do with reference to the bank, except the loans, and Hicks says he told him plainly that Walz was to have nothing to do with the operation of the bank; that, "of course, Mr. Walz is down there, and if he has the time, and you gentlemen want him to do anything, that is entirely up to him, but he is not going down there with that intention."

It appears that, after Walz went down to Gillette, there was some dissatisfaction, and Mr. Norden, Mr. Jones and Mr. Sanders called on Mr. Hicks, and said that Walz was not satisfactory to the directors. Hicks told them that, if Walz was not satisfactory, they would

get somebody else who was. Hicks saw Walz, and told him about the complaint, and afterwards wrote the bank that Walz knew that he did not own the bank, but was only acting as our trustee, and we thought this action would be satisfactory to the directors. These directors afterwards wrote a letter in which they stated they were getting along just fine with Mr. Walz, and were pulling together for the interest of the bank's affairs, thanking Mr. Hicks for his attention in the matter, and stating that no doubt his talk helped them to get together; stated also in the letter that, if any time something needed attention, they would keep Hicks advised.

Mr. Norden testified that their verbal contract was not reduced to writing at all; that they received the written agreement later. Norden testified that they did not put in there they were going to see us through if it took them from one to five years. Norden said he did not agree to the contract until they said they were going to see us through. There can be no controversy, of course, about the written contract. It is introduced in evidence, and speaks for itself, and it is the only contract entered into between the parties, and the plaintiffs contend that, under that contract, the American Bank became liable to the creditors of the Bank of Gillette.

At the time the contract was entered into, the Bank of Gillette was largely indebted to the American and St. Louis banks. The condition of the country was such that the Bank of Gillette could not make collections. Many of its loans had been made to rice farmers, and it is said that they were holding rice for a better price, and, for that reason, the Bank of Gillette could not collect, and therefore wanted additional loans from the American and St. Louis banks. Doubtless all parties thought at that time that, if it could get additional loans from these banks, it would tide it over until it could make collections from the rice farmers, and then could pay all of its obligations.

We do not think that the fact that the conditions were such that the collections could not be made without great difficulty and without disastrous results to the borrowers,

tends to show that the parties were in bad faith. When money is loaned by a bank at any time to persons who depend on rice crops or any other crops to make payments, the lender necessarily takes some chances, because no one can tell in advance whether there will be a good crop or a poor crop, nor can any one tell whether the price will be high or low, and the ability of the producer to pay is influenced by both the amount of crop raised and the price the producer can get for it.

We think it appears from the record in this case that a reasonable, prudent business man would have been justified in believing that the debtors of the Bank of Gillette, if given a little time, could pay their obligations and, if so, the Bank of Gillette would have been in prosperous condition. This was evidently the belief of the American and St. Louis banks when they agreed to advance additional sums of money to the Bank of Gillette, and, if this is true, they had the right to have somebody present at the bank to look after the collateral, loans, and collections, and for protection. It is not unreasonable, since the Bank of Gillette was already indebted to them largely, that they would want to look after their interests, if they were going to advance them additional sums of money.

There can be no doubt, if the American bank and the St. Louis bank had authorized Walz to do what the witnesses swear that he did do in connection with the Bank of Gillette, they would have been liable. If the American and the St. Louis banks had authorized Walz to take charge of the Bank of Gillette, or if these banks had used the Bank of Gillette as an instrument through which to carry on their business, or had operated it as a branch bank, or had taken the management and control of the same, their liability would have been the same as if they had done the business in their own name; but, whether these banks became liable depends, not upon what Walz said or did, unless what he said and did was either authorized by them or the knowledge of these things brought home to them, but their liability depends upon

the contract entered into. The contract provides for the employment of Walz as a trustee for the two banks, to represent them as they had agreed, with the Bank of Gillette. The two banks certainly had the right to enter into a contract with the Bank of Gillette that, if the Bank of Gillette would employ Walz so that he might look after the loans and the collateral, they would be willing to lend $75,000 additional to the Bank of Gillette.

The assets of the Bank of Gillett at the time were in excess of its liabilities, but the condition of the country was such that it could not collect immediately, and needed more money, because it could not at that time collect from the rice growers, or, rather, it was thought inadvisable to try to collect at that time, and, since the Bank of Gillett was already largely indebted to these two banks, it would have authority to agree to carry its cash balances with these two banks. Certainly there could not have been anything wrong, if they were going to lend the money that it needed, to require it to keep its cash balances with them, rather than with some other bank. They could also lawfully require Walz to obtain all the collateral to hold in trust to secure them, and give him absolute authority in accepting loans and collateral. The notes taken from the Bank of Gillette for the money advanced were to be made payable on demand, and the collateral to be held in trust for the banks advancing the money.

We do not think that any of these things, or all together, could be construed as authority to take over the Bank of Gillette, or to take control or management of the same. This contract could not be construed to mean that the two banks were operating it as a branch bank or as an instrument through which to carry on their business, and that is the important question, so far as the liability of the banks is concerned. If they managed it, operated it, and controlled it, we have already said they would be liable, or if the contract could be construed as authorizing Walz to assume control; his authority and duties are those prescribed by the contract. It is earnestly insisted that there was an oral contract or agreement. In

answer to that, however, it is sufficient to say that, whatever discussion or statements there may have been prior to the consummation of the written contract, the agreement of the parties was finally reduced to writing, and the oral statements made prior to that time were merged in that contract, and the written contract became binding on all parties.

This court has said: "Antecedent propositions, correspondence, and prior writings, as well as oral statements and representations, are deemed to be merged into the written contract which concerns the subject-matter of such antecedent negotiations, when it is free from ambiguity, and complete." *D. K. & S. Rd. Co.* v. *M. & N. A. Rd. Co.*, 104 Ark. 475, 149 S. W. 60.

Again it is said: "Prior oral agreements and antecedent writings forming a part of the negotiations for a contract become merged in the subsequent written contract, and are incompetent as evidence for the purpose of enlarging the scope of such written contract." *Harrower* v. *Insurance Co. of North America*, 144 Ark. 279, 222 S. W. 39.

There can be no doubt in this case that the oral agreement, if there was any, was merged in the written contract, and it is universally held that a written contract, free from doubt and ambiguity, cannot be altered or contradicted by parol evidence except for fraud or mistake. It therefore follows that, unless the appellant is liable under the written contract, it would not be liable.

"It is true, of course, that the parties to a written contract may, subsequent to its execution, modify and substitute an oral agreement therefor." *Cook* v. *Cave*, 163 Ark. 407, 260 S. W. 49.

But the parties in this case did not claim that, after the execution of the written contract, it was in any way modified, or that an oral contract was substituted for it. They claim to have called on Mr. Hicks because of the alleged misconduct of Mr. Walz. They evidently thought that Walz was exercising authority that he did not possess under the terms of the agreement. After their inter-

view with Mr. Hicks, they wrote a letter stating, in sub-
stance, that Mr. Walz's conduct was satisfactory.

It thus appears that the directors of the bank did not
themselves think that Mr. Walz had authority to do what
he was doing. In fact, they knew what his authority was,
because they had a copy of the contract themselves, which
expressly stated the authority of the agent. There was a
great deal of testimony introduced with reference to the
acts and declarations of Mr. Walz, and it is earnestly
argued that these show that the Little Rock and St. Louis
banks had taken charge of the affairs of the Bank of
Gillette. There is, however, no principle of law better
established than the principle that you can neither prove
agency nor the extent of an agent's authority by his
declarations or actions. The principle is well stated in
Mechem on Agency, vol. 1, § 285. The rule is stated
there as follows:

"The authority of an agent, and its nature and
extent, where these questions are directly involved, can
only be established by tracing it to its source in some
word or act of the alleged principal. The agent certainly
cannot confer authority upon himself or make himself
agent merely by saying that he is one. Evidence of his
own statements, declarations or admissions, made out of
court, therefore (as distinguished from his testimony as
a witness), is not admissible against his principal for the
purpose of establishing, enlarging or renewing his
authority, nor can his authority be established by show-
ing that he acted as agent or that he claimed to have the
powers which he assumed to exercise. His written state-
ments and admissions are as objectionable as his oral
ones, and his letters, telegrams, advertisements and other
writings cannot be used as evidence of his agency. The
fact that the agent has since died does not change the
rule. Where his authority is in writing, he cannot extend
its scope by his own declarations. His acts and state-
ments cannot be made use of against the principal until
the fact of the agency has been shown by other evidence."

This court has many times held that the acts or declarations of one does not prove that he is an agent, and that the agent cannot bind his principal beyond the limits of his authority. It therefore follows necessarily that the acts and declarations of Walz, that were beyond his authority as contained in the written contract, are not binding on the bank. This brings to us a consideration of the contract itself, and to the question as whether, under the contract, the banks took such charge and control of the Bank of Gillette as would make them liable to the creditors of the bank in this suit.

We think that the contract is close to the border line, but, after a careful consideration of the contract itself, together with all the testimony in the case, and the very able arguments of learned counsel on both sides, we have reached the conclusion that, under the contract, the American Southern Trust Company is not liable to the creditors of the Bank of Gillette. We think that, under the contract, they did not take such control and management of the Bank of Gillette as would make them liable.

Of course, it is true that a principal is liable for the acts of his agent, although they might not be authorized, if they were within the apparent scope of his authority.

Apparent authority is that which, though not actually granted, the principal knowingly permits the agent to exercise, or holds him out as possessing.

In the view we have taken of this case, Walz had no apparent authority beyond the authority given to him in the written contract, because there is no evidence of the banks' holding him out as having any other additional authority. Such authority cannot be proved by his acts or declarations, unless the principal authorized his acts or declarations, or knew of them.

"Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume, or which he holds the agent out as possessing, such authority as he appears to have by reason of the authority which he has; such authority as a reasonably prudent person, using diligence and discretion in view of the

principal's conduct, would naturally suppose the agent to possess." *Ozark Mutual Life Association* v. *Dillard,* 169 Ark. 136, 273 S. W. 378.

It will be observed that the court has held in the above cited case that the principal is bound only when he knowingly permits the agent to act for him, or when he holds the agent out as possessing power to act; that is, his acts are within the apparent scope of the authority of the agent if the principal knowingly permits his agent to do certain things or assume certain authority, or such authority as he appears to have by reason of the authority which he actually has.

There is no testimony in this case tending to show that the principal held out Walz as having authority to do anything except what was authorized under the written contract, and it is a well-established principle of law that one dealing with an agent, without inquiring of the principal of his authority, does so at his peril. It is not sufficient that he knows of the acts and declarations of the agent, or that he makes inquiry of the agent; he must make inquiry of the principal, or he must know of the acts or declarations of the principal in order to determine the authority of the agent. Counsel discuss not only the principle of apparent authority, but also the question of estoppel. There could be no estoppel, of course, unless the principal knew of the acts or declarations of the agent and the things that the agent did, and, as we have already said, the principal is not bound by either the acts or declarations of its agent unless within the apparent scope of his authority. If they had authorized Walz to take charge of the affairs of the bank, to run the bank for them, or to displace the board of directors or officers of the bank, the appellant bank would have been liable in the same way that it would if it had taken charge of the bank and operated it in its own name, but, under the authority in the contract, Walz had no right to do the things it is alleged that he did, and the officers and board of directors had no right to permit him to do these things. If the bank is not liable, it follows, of course, that George

F. Walz is not liable under the contract, and, as he was not a director or an officer of the bank, we think he is not liable under the proof in this case.

There are several cross-appeals; the cross-appeal of the Atlas Oil Company and of the Mente & Company, Inc. The claim of the Atlas Oil Company was disallowed by the chancellor, and it is argued that there is no evidence to sustain the chancellor's findings. The chancellor had before him all of the evidence in the case, a portion of which showed the business in which the oil company was engaged, also the evidence of dealing in oil by Sam T. Poe, and this is true also of the claim of Mente & Company, Inc., and we think there was sufficient evidence before the chancellor to justify his findings, and that he was correct in his findings, unless the claimants had introduced proof to show that their claims were for money deposited.

As to the findings of the court below on the claim of the First National Bank of DeWitt and L. A. Black, we cannot say that the finding was against the preponderance of testimony. It follows from what we have already said that the decree against the American Southern Trust Company and Geo. F. Walz must be reversed and dismissed, and the decree in all other respects should be affirmed. It would be useless to set out or discuss all the testimony in the case. After a careful examination of the entire record, we have reached the conclusion above set forth, and the decree of the chancery court against the American Southern Trust Company and George F. Walz is reversed and dismissed, and the decree in all other things is affirmed.

KIRBY, J., disqualified.

MEHAFFY, J., (on rehearing). It is insisted by the appellee, in its argument on petition for rehearing, that the court in its opinion wholly overlooks two major contentions of appellee. First, that appellant was cooperating with the officers of the Bank of Gillette in keeping it open and holding it out to the public as a solvent institution, when it was

insolvent, and known to be so by the officers and directors and appellant; that this constituted fraud on the depositors who put their money in the institution, and was a wrongful act, rendering all persons and corporations participating in it jointly and severally liable to the persons damaged thereby. The second is that the court ignored the contention of appellee that loans were made to Crandall, to Wm. Molls, to Simmons and Brock and others in excess of 30 per cent. of the capital stock, and that, as a result of such loans, more than $50,000 of this excess was lost; that such loans were made in violation of the banking laws of the State.

The appellee, in his argument on the petition for rehearing, takes up, first, the proposition that Walz was a general agent of appellant, and that appellant is liable to third persons dealing with the Bank of Gillette through Walz, and argues that the court, in its opinion, laid down a rule which applies only to cases of special agent and is never applied to the acts of a general agent.

"While the courts have very often defined and distinguished general and special agents, the great trouble is that they are totally unable to define general and special agents in terms which make the distinction applicable to each particular case. Their powers, when properly analyzed, however, are governed by the same general principle, to-wit, they can do anything within the scope of their agency so as to bind the principal, notwithstanding there may be some secret instructions limiting their powers; and, whether the authority be general or limited, they cannot charge their principals if they exceed it. They are of course more likely to transcend the bounds of a narrow than of an extended power; but the principle in either case is the same." 31 Cyc. 1338.

"A general agent, unless he acts under a special and limited authority, impliedly has power to do whatever is usual and proper to effect such a purpose as is the subject of his employment. Hence, in the absence of known limitations, third persons dealing with such a general agent have a right to presume that the scope and char-

acter of the business he is employed to transact is the extent of his authority. This rule, as already stated, does not apply when limitations upon the authority of the agent have been brought home to the knowledge of the third person dealing with him, nor when the third person fails to make such inquiry as conditions demand, especially if the facts and circumstances are such as to suggest inquiry. Furthermore, the implied power of any agent, however general, must be limited to such acts as are proper for an agent to do, and cannot extend to acts clearly adverse to the interests of the principals, or for the benefit of the agent personally. And an agent has no implied authority to do acts not usually done by agents in that sort of transaction, nor to do them in other than the customary manner. The most general authority is limited to the business or purpose for which the agency was created.

"The authority of a special agent must be strictly pursued, and those dealing with him must, at their peril, determine the extent of his authority; for, as in the case of acts and transactions of a general agent, a special agent cannot bind his principal by acts outside the scope of his authority. A special authority, like a general authority, confers by implication all powers necessary for or incident to its proper execution, and secret instructions or restrictions do not limit the special agent's authority, so far as innocent third persons are concerned; and if a principal has permitted a special agent so to act as reasonably to induce others to credit him with broader powers than he actually possesses, he will be estopped to deny the existence of as broad an authority as he permitted the special agent to exercise." 31 Cyc. 1340.

The above is a general statement of the law with reference to general and special agents, and, we think, a correct statement, and we do not think there is any conflict with the general rule and the rule announced by this court in its original opinion.

Walz was authorized, under the written contract, to deal with loans and collaterals. In other words, he was to have absolute authority in the granting of loans and accepting collateral. No loans were to be made by the Bank of Gillette without first obtaining the approval of Walz. And we hold that he would bind his principals in doing anything within the apparent scope of his authority as to loans and collateral. This would be true whether he was a general or a special agent. He would, however, have no implied authority to take charge of and run the Bank of Gillette, and for depositors, creditors or any other persons to act on the assumption that Walz had authority would not be justified, but would be assuming that he was acting in violation of law. The statute provides that the affairs of and business of the bank shall be managed and controlled by a board of directors of not less than three, who shall be selected from the stockholders at such time and in such manner as may be provided in its by-laws. Crawford & Moses' Digest, § 683.

The board of directors of the Bank of Gillette, in the management and control of its affairs, made the contract, doubtless believing, at the time they made it, that it was the best arrangement they could make at the time in the management of the affairs of the bank. And, assuming that Walz was a general agent, he was a general agent with reference to loans and collaterals only, and he had no implied authority to take charge of the affairs and manage and control the affairs of the bank when the law expressly provides that the directors must do this. He had authority to do anything with reference to loans and collaterals, and his principal was bound by his acts, but, as to the other acts complained of, unless he was held out by his principal as having authority to do them, or was authorized, or his acts were ratified, the principal would not be bound.

We have not overlooked the distinction between the powers and authority of a general and special agent, and we have not overlooked the rule stated in R. C. L., which

is as follows: "There is a marked distinction between the power and authority of a general and a special agent to bind his principal. A general agent is usually authorized to do all acts connected with the business or employment in which he is engaged, while a special agent is only authorized to do specific acts in pursuance of particular instructions, or with restrictions necessarily implied from the act to be done. Where it appears that an agent has done an act for the benefit of his principal and that the latter has not questioned the authority of the agent to bind him, it will be presumed, until the contrary appears, that the agent was duly authorized. Although the agent exceeds his authority, the principal will be bound to the extent that he has acted within the powers conferred on him. In other words, the authorized acts of the agent are valid, and only those in excess of his authority are invalid. A person dealing with an agent must not act negligently, but must use reasonable diligence to ascertain whether the agent acts within the scope of his powers. He is not authorized, under any circumstances, blindly to trust the agent's statements as to the extent of his powers. * * * Very obviously, the principal is liable for all such acts and statements of his agent as he may have expressly authorized; and this includes, by implication, whether the agency be general or special, all such powers as are necessary and proper as a means of effectuating the purposes for which the agency was created. Being clothed with power to do a particular act, the agent will be deemed to have also whatever authority attaches to the doing of the act or is necessary to its performance." 21 R. C. L. 853-4.

One of the cases decided by this court, to which attention is called by the appellee, is *Liddell* v. *Sahline,* 55 Ark. 687, 17 S. W. 705. The court in that case said:

"A person dealing with a general agent can hold the principal, if the acts of the agent are within the general scope of the business intrusted to him."

All the other cases decided are practically to the same effect. We do not think there is anything in the

above case that contradicts the rule announced by the court in the original opinion.   Walz was appointed with reference to loans and collateral, and everybody dealing with him had a right to assume that any thing or act within the general scope of his authority with reference to those matters was authorized by his principal.   We have not overlooked the testimony of Jones, Norden and Koen, nor can there be any question or doubt that the contract entered into gave Walz authority as to loans and collateral.

Appellees contend that the letter of April 15, 1922, shows that Walz had authority to employ attorneys for the Bank of Gillette and to make contracts for it.  That it was stated that there would possibly be cases where he and the directors would not agree, but that in such cases the voice of the directors was not to prevail, but the matter was to be referred to Walz's principals, and his principals would make their decision as to which way the matter should be handled.

They then argued that the learned chancellor deemed that sufficient to support a finding that appellant did authorize Walz to do the things which the witnesses swear that he did do.   And they add that, unless it can be said that the chancellor's finding is against the reasonable construction to be placed upon this evidence, his finding should not be reversed by this court.   The letter referred to not only does not justify the conclusion that Walz had authority to employ attorneys for the bank, but the letter expressly states that the writer called to the attention of Mr. Coffman and Mr. Walz the complaint registered.   And the writer of the letter adds: "We considered the entire proposition at length.  So we have agreed that you can do just as you like about the employment of an attorney, which will be perfectly satisfactory with Mr. Walz.   If you decide to employ the attorney at DeWitt in addition to the attorney at Stuttgart, there is no objection to that."

We think also that the testimony of Mr. Hicks as to the agency contradicts the construction placed upon the

letter by appellees. Mr. Hicks testified: "Mr. Norden himself raised that question in our conference as to whether or not Mr. Walz was to have supervision of the bank, and I told him positively no, that we did not want Mr. Walz to have anything to do with the operation of the bank. All that we wanted him to do was to represent us as our trustee in the handling of the collateral and loans," etc.

The above is the testimony of Mr. Hicks with reference as to what was said in the conference, and this testimony is not denied by any of the parties in the conference.

Mr. Hicks also said in his testimony: "I told Mr. Walz very plainly at that time that all we wanted him to do was to act as our trustee in the handling of the collateral; that we wanted him to obtain all the collateral on the notes that the Bank of Gillette had, keep them under his supervision; to assist them in collecting those notes, to assist them in getting better collateral on the notes that they had, and supervise in an advisory capacity the granting of new loans, and he was not to make any new loans without the approval of the directors, and he was to have nothing to do whatever with the inside operation of the bank."

Mr. Sanders himself testified that he did not say that the bank was wrongfully handled, and that Mr. Hicks said that the American Bank desired to assist them in their financial troubles, and that if Walz could not get along he would give us a man that could.

We have already held, in the original opinion, that the authority of Walz was limited by the written contract. Appellees, in their brief for rehearing, say that, unless the finding of the chancellor is against the reasonable construction to be placed upon the evidence, his finding shall not be reversed by this court. That is true, but that means his finding of facts, and we have held that the statements and acts of Walz are not competent to prove the extent of his authority. It is also insisted that the appellant knew that Walz was running the Bank

of Gillette.   We think the testimony of Mr. Hicks, above quoted, to the effect that he made the statement at the conference, is sufficient to show that the appellant did not know that Walz was running the bank, but instructed him that he was not to and could not run the bank.   Mr. Hicks also told them that, if Walz's conduct was not satisfactory, they would get them another man and send down there.

The statement in the letter above referred to, that Mr. Walz was willing to submit to the board of directors any contract that he has made, etc., evidently meant contracts that he had authority to make.   And the decision referred to that would be made by the creditor banks necessarily meant decisions with reference to the loans and collaterals. Really what the directors objected to in Walz was his manner and the way he talked to people.

It is next insisted that the appellant aided the Bank of Gillette to keep open and receive deposits while said bank was insolvent and known to the appellant to be insolvent.   If there were no evidence in the case as to the condition of the country at the time the contract was made, such condition was matter of common knowledge. Many institutions and persons would have failed if they could not have got help, and apparently it was thought that, by lending the Bank of Gillette $75,000 additional money, that additional money would enable the bank, not only to pay its debts, but to assist the farmers to make another crop, and at that time it appears that everybody was of the same opinion.

Mr. Maxwell was Bank Commissioner, and had supervision over all the banks of the State. The Bank of Gillette filed its statements as required by law, and the department made special investigation of the affairs of the bank.   He discussed the matter with Mr. Hicks, and learned that Mr. Hicks or the American Southern Trust Company was willing to extend further credit in conjunction with the First National Bank.   Mr. Maxwell further says that, in 1920 and 1921, not only banks but

financial institutions in general were needing all the assistance they could get to preserve their existence; that the condition was brought about by the deflation of values in commodities; and that we had no forewarning of it; that, as a result of this condition, many banks in the State were suddenly placed in a condition where they were over-extended; that he had a conference with representativess of the Little Rock banks for the purpose of obtaining cooperation of the larger institutions in Little Rock in assisting the country banks throughout the State. He said the reports filed by the Bank of Gillette during his administration did not indicate insolvency, and, if he had thought it was insolvent, he would have required it to restore any impairment of its capital by levying an assessment on its stockholders, if necessary. He further said if there had been any indication of insolvency he would have closed the bank. It therefore appears that the Bank Commissioner, whose duty it was, under the law, to know, did not believe it was insolvent, and the appellant did not believe it was insolvent. The Bank Commissioner was told about the contract. It has been suggested by some of the appellees that the contract was kept secret. It was made known to the banking department; it was spread on the records of the Bank of Gillette, and every time the Bank of Gillette was examined by the banking department it was known, and we do not think there was any effort to keep it secret.

Petitioners call our attention to a statement in the opinion with reference to lending money on crops, and states that the court evidently overlooks the proof that new money had to be loaned to persons already indebted to the bank before they could start making rice crops. As we have already said, the situation was bad. It was necessary to furnish the rice farmers with money to make crops, or they could not make them, and doubtless everybody thought at the time that that was not only the best, but the only, way by which they could collect what the rice growers already owed.

In addition to this, the proof was that the American Bank loaned on real estate approximately $50,000, and thereby enabled the Bank of Gillette to pay $50,000 of its indebtedness with money received loaned on real estate which was not, prior to that time, pledged to the Bank of Gillette. That the Bank of Gillette was hard pressed and needed to borrow more money was, of course, known to all the parties. But, if a bank in that condition could not borrow money because the lender would become liable for all its debts if he advanced money, then, if a bank should happen to get where it did not have money to meet its obligations, it would have to fail, no matter how much property it had. If lending money by one bank to another when the borrowing bank needed it would make the lender liable for all the debts, and liable, as appellees argue, for fraud in keeping the bank open, then no bank could afford to lend another money.

It is next contended that the appellant is liable for loans made by its agent, Walz, in excess of the statutory limit, and lost. The liability referred to by appellees is a statutory liability, but there certainly could be no liability on the part of the bank because of the loans made to Crandall, Moll and others. These parties were already indebted to the Bank of Gillette before Walz went there. And Mr. Norden says in his testimony that the bank had a large number of loans outstanding when Walz came. Crandall's debt was reduced while Walz was there. Walz held the borrowers down, and that made some of them sore. But the lending money to these parties mentioned by appellees was evidently for the purpose of collecting the debt these parties already owed.

After a careful reexamination of the entire record we have reached the conclusion that the original opinion was correct, and the petition for rehearing is therefore denied.